UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES POSTAL SERVICE,<br>475 L'Enfant Plaza, SW,<br>Washington, DC 20260,<br><br>      Plaintiff,<br><br>      v.<br><br>NATIONAL POSTAL MAIL HANDLERS UNION, AFL-CIO,<br>815 16th Street, NW, Suite 5100,<br>Washington, DC 20006,<br><br>      Defendant. | Civil Action No. 25-1361 |

## COMPLAINT TO VACATE ARBITRATION AWARD

Plaintiff the United States Postal Service brings this action against Defendant National Postal Mail Handlers Union, AFL-CIO, to vacate an arbitration award and alleges as follows:

1. Pursuant to Title 39 U.S.C. § 1208(b), Plaintiff the United States Postal Service ("Postal Service") requests that this Court issue an Order to vacate Arbitrator Daniel Brent's February 3, 2025, Award (the "February 2025 Award" or "Award") in favor of Defendant National Postal Mail Handlers Union, AFL-CIO (the "Union") in Case No. Q-16M-6Q-C-19403051.

2. Arbitrator Brent (the "Arbitrator") acted beyond the scope of his authority by awarding remedies that do not draw their essence from the parties' collective bargaining agreement, that expressly conflict with that agreement, and that are contrary to applicable law. For these reasons, and for the reasons discussed herein, the Postal Service seeks vacatur of the February 2025 Award.

**JURISDICTION AND VENUE**

3. This Court has jurisdiction pursuant to 39 U.S.C. §§ 409(a) and 1208, and pursuant to 28 U.S.C. §§ 1331, 1339, 2201 and 2202.

4. Venue is proper pursuant to 39 U.S.C. § 1208(d) and 28 U.S.C. § 1391(b).

**PARTIES**

5. The Postal Service is an independent establishment of the Executive Branch of the United States Government. 39 U.S.C. § 201. The Postal Service's headquarters are located at 475 L'Enfant Plaza, SW, Washington, DC 20260.

6. The Union is a labor organization representing mail handlers employed by the Postal Service throughout the United States. The Union's headquarters are located at 815 16th Street, NW, Suite 5100, Washington, DC 20006.

**LEGAL BACKGROUND**

**I.     Contractual Provisions**

7. At all times relevant to these proceedings, the Postal Service and the Union (collectively, the "Parties") were signatories to a collective bargaining agreement (the "CBA" or "Agreement"), a true and correct copy of which is attached as Exhibit A ("Compl. Ex. A").

8. The Agreement provides the terms and conditions of employment for the bargaining unit employees represented by the Union.

9. Article 15.1 of the Agreement memorializes a comprehensive, multi-step grievance arbitration procedure for the resolution of any "dispute, difference, disagreement or complaint between the parties related to wages, hours, and conditions of employment" (the "grievance arbitration procedure"). The grievance arbitration procedure culminates in a hearing before an arbitrator appointed by the Parties. Agmt. at art. 15.4, Compl. Ex. A.

10. Following a hearing, arbitrators "should render an award . . . within thirty (30) days of the close of the record in the case." *Id.* at art. 15.4.B.9.

11. Arbitral awards are "final and binding," but "[a]ll decisions of arbitrators shall be limited to the terms and provisions of this Agreement, and in no event may the terms and provisions of this Agreement be altered, amended, or modified by an arbitrator." *Id.* at art. 15.4.A.6.

12. The Agreement reserves to the Postal Service the right to develop its own policies. The Management Rights clause memorialized in Article 3 gives the Postal Service "the exclusive right, subject to the provisions of this Agreement and consistent with applicable laws and regulations" to run its operations, including to "determine the methods, means, and personnel by which such operations are to be conducted." *Id.* at art. 3.4.

13. The Agreement sets forth different classification categories of Union employees, including those in the "regular [employee] work force," comprised of full-time and part-time employees, *id.* at arts. 7.1.A.1, 7.1.A.2, and the "Mail Handler Assistant [or "MHA"] employee work force," comprised of noncareer bargaining unit employees. *Id.* at art. 7.1.C.1.

14. The Agreement imposes a limitation on the number of Mail Handler Assistants who are authorized to work in a given Postal Service district or installation as follows:

> The total number of MHAs within a district will not exceed 18.5% of the total number of career mail handlers in that district, but not more than 23.5% in any installation. The Employer will provide the Union at the National level with an accounting period report listing the number of MHAs at each installation and in each district. This report will be provided within fourteen (14) days of the close of the accounting period. In the event that the Employer exceeds the 18.5% limitation by district, or the 23.5% limitation by installation, a remedy, if any, will be determined by the individual facts and on a case-by-case basis.

*Id.* at art. 7.1.C.3.

15. When evaluating the need to subcontract work, the Postal Service "will give due consideration to public interest, cost, efficiency, availability of equipment, and qualification of employees[.]" *Id.* at art. 32.1.A.

16. The Agreement requires that, with respect to subcontracting:

> The Employer will give advance notification to the Union at the national level when subcontracting which will have a significant impact on bargaining unit work is being considered and will meet with the Union while developing the initial Comparative Analysis Report. The Employer will consider the Union's views on costs and other factors, together with proposals to avoid subcontracting and proposals to minimize the impact of any subcontracting. A statement of the Union's views and proposals will be included in the initial Comparative Analysis and in any Decision Analysis Report relating to the subcontracting under consideration. No final decision on whether or not such work will be contracted out will be made until the matter is discussed with the Union.

*Id.* at art. 32.1.B.

17. The Agreement also includes several memoranda of understanding agreed upon by the parties related to certain of the contractual provisions contained therein. Relevant here, the parties' Memorandum of Understanding regarding Article 32 of the Agreement (the "Article 32 Memorandum") provides in relevant part:

> In addition to the cap on MHAs set forth in paragraph 7.1C.3 . . . the parties may agree on the use of additional MHAs in other circumstances when new or contracted work is brought in-house. In addition, whenever contracting-out or in-sourcing is under consideration, the Union may propose different hourly rates for such MHAs to ensure competitiveness with outside services.

*Id.* at 200.

## FACTUAL BACKGROUND

18. The underlying dispute between the parties related to the Postal Service's decision to subcontract work to a third party for the Kansas City, Kansas Surface Transportation Center facility ("STC" or the "Kansas City Facility") and whether the process complied with Article 32 of the Agreement and the Article 32 Memorandum.

19. In an August 15, 2022, Award (the "Liability Award"), Arbitrator Brent concluded that "[t]he Employer failed to provide the Union with an opportunity, as required by the Article 32 Memorandum of Understanding, to propose different percentages of, or hourly rates for, [Mail Handler Assistants] to ensure competitiveness with outside services before the Employer decided to subcontract the Kansas City" Facility. Liability Award at 1, Compl. Ex. B.

20. While the Arbitrator concluded that the Postal Service's failure to provide notice violated the Article 32 Memorandum, he also made clear that the "[Liability] Award does not address or decide whether or not the Employer's ultimate decision to subcontract the Kansas City [Facility] was correct under Article 32.1.A." *Id.* at 24. In other words, the Arbitrator did not decide that the Postal Service should have awarded the work to the Union, only that it failed to provide notice.

21. The Liability Award further stated that "[t]he parties have agreed to discuss fashioning a remedy for these violations and to preserve the Arbitrator's jurisdiction to create and impose a remedy if the parties cannot agree." *Id.* at 24.

22. The parties were unable to agree upon a remedy and therefore returned to Arbitrator Brent for a remedy hearing, which was held on March 13 and 14, 2024.

23. At the hearing, the Postal Service argued that even if the required notice was provided, the Union could not demonstrate that its members were prejudiced, and therefore no monetary award was appropriate.

24. In addition, the Postal Service argued that the Union could not prove that it could or would have submitted a viable offer to perform the work that would have been competitive with the subcontract and that, to the extent any remedy was appropriate, it should be tailored to

remedying the actual violation—i.e. failing to give the Union the opportunity to participate in the Article 32 process before the Postal Service reached a decision on subcontracting.

25. The Union argued that to remedy the contract violation, the Postal Service should be ordered to pay compensatory damages to the bargaining unit members for all the work they could have performed for the entire length of time when contractors performed the work.

26. Neither the Postal Service nor the Union contemplated nor proposed a remedy other than potential compensation to bargaining unit members.

27. On September 16, 2024, Arbitrator Brent e-mailed the parties a cover letter and a document that he referred to as a "Draft Proposed Remedy Award" (the "September 2024 Draft Award"). Sept. 2024 Draft Award, Compl. Ex. C.

28. The September 2024 Draft Award made several threshold findings that remained unchanged in the February 2025 Award the Arbitrator ultimately signed. First, the Arbitrator concluded that "[t]he Employer has argued persuasively that the case law and arbitral precedents between these two parties preclude arbitrators from imposing a punitive remedy." *Id.* at 5; *see also* Feb. 2025 Award at 4, Compl. Ex. D. Second, the Arbitrator concluded that "there is no contractual, legal, or logical basis to pay employees not on the payroll for work they would have performed only if concessions that have not been established would have been accepted by the employer." Sept. 2024 Draft Award at 6, Compl. Ex. C; *see also* Feb. 2025 Award at 6, Compl. Ex. D.

29. Based on those findings, but still wanting to provide some form of remedy, the Arbitrator awarded the Union "union dues for the four-year term of the outsourcing contract" and "payments to [any] Union administered fund, for example an Education and Training Fund." Sept. 2024 Draft Award at 11, Compl. Ex. C.

30. Arbitrator Brent did not sign the September 2024 Draft Award. Sept. 2024 Draft Award at 13, Compl. Ex. C.

31. The cover letter from Arbitrator Brent accompanying the September 2024 Draft Award acknowledged that it was "unprecedented" for the Arbitrator to issue an unsigned award for further discussion between counsel and the Arbitrator.

32. Neither the parties' Agreement, nor the past practice between the parties, authorized, much less contemplated, the Arbitrator's issuance of an unsigned "Draft Award" for review and further discussion.

33. On October 11, 2024, without first consulting the Postal Service and over its eventual objection, the Union submitted a seven-page, single spaced letter brief to the Arbitrator responding to the September 2024 Draft Award. In its brief, the Union largely raised the same arguments it had made in its post-hearing brief but added that the Arbitrator should be aware that the amount of money from dues here was probably a lot less than what he may be expecting.

34. The Postal Service responded via email to the Union's brief on October 16, 2024.

35. On February 4, 2025, Arbitrator Brent emailed the parties another award, dated February 3, 2025, which he called the Supplemental Interim Award (the "February 2025 Award."). Feb. 2025 Award, Compl. Ex. D.

36. Arbitrator Brent signed the February 2025 Award. *Id.* at 12.

37. While it is not entirely clear that the Arbitrator intended the signed February 2025 Award to constitute a final and binding arbitration award that is subject to judicial review, the Postal Service filed the instant Complaint out of an abundance of caution to avoid any waiver its rights to seek vacatur in this Court.

38. The only relief sought by the Union at the remedy hearing before Arbitrator Brent, and contemplated by either party, was the possibility of back pay for bargaining unit members.

39. In the February 2025 Award, as in the September 2024 Draft Award, Arbitrator Brent rejected the Union's proposed calculation of a monetary remedy based on lost wages, holding that there is "no contractual, legal, or logical basis . . . to pay possible future employees for all work they would have performed if the Employer accepted concessions that have not been demonstrated as substantially more probable than not." Feb. 2025 Award at 6–7, Compl. Ex. D.

*40.* In the February 2025 Award, as in the September 2024 Draft Award, Arbitrator Brent concluded that he was precluded from imposing a punitive remedy for the contractual violation at issue in this case. *Id.* at 4.

41. Despite these findings, the Arbitrator concluded that the Union itself had been harmed by the Postal Service's breach—in the form of "loss of prestige among bargaining unit members" due to the Union's perceived inability to enforce the terms of the CBA—and therefore took the extraordinary, and wholly improper, step of crafting a remedy solely for the Union, and not its members. *Id.* at 8.

42. The February 2025 Award ordered the Postal Service to pay the Union, and not its members, "a sum equal to the Union dues that would have been paid by the total number of contractor employees who performed work at the Kansas City [Facility] that could have been performed by Mail Handler Associates or other [Union] bargaining unit employees during the four-year initial term of the disputed out-sourcing contract if the Employer had agreed to in-source this work after bargaining with the Union as required by the Collective Bargaining Agreement." *Id.* at 3, 12.

43. The February 2025 Award, in contrast to the September 2024 Draft Award, also ordered the Postal Service to pay the Union as compensation for the contractual violation that is the subject of the August 15, 2022 Merits Award a sum equal to twenty-five per-cent of the total amount paid to, or on behalf of, the contractor or to its successors or assigns who operated the Kansas City [Facility] calculated from the date the Kansas City [Facility] began operation to the date that this work may be insourced to [Union] bargaining unit employees. *Id.* at 10–11.

44. By awarding the entirety of the remedy to the Union, and not to its bargaining unit members, the Arbitrator exceeded his authority, created an award that did not draw its essence from the Agreement, and awarded punitive damages that the Arbitrator himself stated were disallowed.

45. In addition, Arbitrator Brent's award of millions of dollars in damages directly to the Union constitutes an improper award of punitive damages that was not requested by either party.

46. Nothing in the Agreement between the parties suggests that the Postal Service consented to the imposition of punitive damages for a breach of the Agreement and awarding them anyway was contrary to the expectations of the parties and exceeded the remedial powers vested in the arbitrator by the Agreement.

## COUNT I
### Vacatur of Arbitration Award

47. The Postal Service reincorporates herein the allegations set forth in the foregoing paragraphs.

48. The February 2025 Award's requirement that the Postal Service pay the Union twenty-five per-cent of the total amount paid by the Postal Service to, or on behalf of, the contractor or its successors or assigns who operated the Kansas City Facility conflicts with and

does not draw its essence from the plain and unambiguous terms of the parties' Agreement, including but not limited to Articles 3, 15, and 32, and the Article 32 Memorandum.

49. By imposing such a remedy, the Arbitrator acted outside of his authority and impermissibly dispensed his own notions of industrial justice, and his Award should therefore be vacated.

## COUNT II
## Vacatur of Arbitration Award

50. The Postal Service reincorporates herein the allegations set forth in the foregoing paragraphs.

51. The February 2025 Award's requirement that the Postal Service pay the Union the union dues that would have been paid by the total number of contractor employees who performed work at the Kansas City Facility if the Postal Service had agreed to in-source the work conflicts with and does not draw its essence from the plain and unambiguous terms of the Agreement, including but not limited to Articles 3, 15 and 32, and the Article 32 Memorandum.

52. By imposing such a remedy, the Arbitrator acted outside of his authority and impermissibly dispensed his own notions of industrial justice, and his Award should therefore be vacated.

\* \* \*

**PRAYER FOR RELIEF**

WHEREFORE, the Postal Service respectfully requests that the Court enter judgment vacating, setting aside, and declaring null and void the February 3, 2025 Award of Arbitrator Brent ordering the Postal Service to pay to the Union (i) twenty-five per-cent of the total amount paid by the Postal Service to, or on behalf of, the contractor or its successors or assigns who operated the Kansas City Facility, and (ii) the amount of Union dues that would have been paid by the total number of contractor employees who performed work at the Kansas City Facility that could have been performed by Mail Handler Assistants or other Union bargaining unit employees, along with any and all other relief the Court deems necessary and proper.

| | |
|---|---|
| Dated: May 5, 2025<br>Washington, DC | Respectfully submitted,<br><br>EDWARD R. MARTIN, JR., D.C. Bar #481866<br>United States Attorney<br><br>By:     */s/ Brian P. Hudak*<br>BRIAN P. HUDAK<br>Chief, Civil Division<br>601 D Street, NW<br>Washington, DC 20530<br>(202) 252-2549<br><br>*Attorneys for the United States of America* |